FREDERICK McLEAN BUGHER, ET AL., EXECUTORS, ESTATE OF FREDERICK H. BUGHER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

MILDRED McLEAN DEWEY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 6035, and 5040, 10012. Promulgated January 11, 1928.

*Eugene Untermyer, Esq.*, and *Adrian C. Humphreys, Esq.*, for the petitioners in No. 6035.

*Adrian C. Humphreys, Esq.*, for the petitioner in Nos. 5040 and 10012.

*Brice Toole, Esq.*, for the respondent in No. 6035, and *Ward Loveless, Esq.*, for the respondent in Nos. 5040 and 10012.

PHILLIPS: The executors of the estate of Frederick H. Bugher petition for the redetermination of deficiencies of $4,836.52 for 1917, $44,716.54 for 1918, and $1,665.92 for 1919, determined by the Commissioner to be due from the decedent. It appears that jeopardy assessments of such amounts were made under section 274 (d) of the Revenue Act of 1924 and that the proceeding arises from the de-

termination of the Commissioner that such assessments should not be abated.

The appeal of Mildred McLean Dewey, Docket No. 5040, is from the determination of deficiencies of $8,247.46 for 1917 and $36,839.21 for 1918. The deficiency for 1917 arises from a jeopardy assessment of $9,572.73 and the determination of the Commissioner that said assessment should be abated in the amount of $1,325.27. Docket No. 10012 arises from the determination by the Commissioner of a deficiency of $182.86 in income tax for 1919.

The basic facts in each of these proceedings are the same, although there are differences with respect to such details as amounts of payments or receipts. The same questions of law are involved in each and on request of counsel they were consolidated for the purpose of decision. There are no questions of fact involved, each of the cases having been submitted on a stipulation of facts which has become a part of the record. In such circumstances it seems unnecessary to set out here the details contained in the stipulations since a summary of the principal facts will serve every purpose.

In 1892 Mrs. Mary L. McLean and her three children, Mrs. Mary McLean Bugher, Mrs. Mildred McLean Dewey, and John R. McLean, together with one Hopkins Loudon, caused the Argyle Lead and Fluorspar Mining Co. to be formed to take over the operation of a property producing fluor spar mineral and some lead. Somewhat less than one-half of the stock was issued to Loudon and the balance divided equally among the four members of the McLean family. The company was not successful and went into the hands of a receiver. In 1895 John R. McLean bid in the properties of the said company at a receiver's sale for $60,000 and at the same time divided the interest in these mines in equal shares between his mother, his two sisters and himself and thereafter until his death conducted the mines for the joint benefit of these persons and their successors in interest.

In 1901, the mother, Mary L. McLean, died and her interest was left to be divided in equal portions among her three children for life, with remainder over to their next of kin. Mrs. Mary McLean Bugher (then Ludlow), died on November 21, 1915, and thereupon her interest in these mines descended to her son, Frederick H. Bugher. The latter died November 25, 1924, and the executors of his estate are the petitioners in one of the proceedings before us. John R. McLean died on June 9, 1916. The American Security & Trust Co. became executor under his will and thereafter proceeded to operate the mines in the interest of his estate and the other parties in interest.

For many years after 1895 no substantial profits were made from the operation of the mines. In 1909, John R. McLean caused

assignments to be executed by Mrs. Bugher and Mrs. Dewey, transferring to him one-half of their interest, thereby purporting to acquire a two-thirds interest and leaving a one-sixth interest in each of his sisters. After the year 1910 the earnings from the mine improved and prior to 1917 some of the earnings had been distributed on the basis of two-thirds to McLean and one-sixth to each of his sisters. After the death of his mother in 1915, Frederick H. Bugher made investigations and employed counsel in respect of the transactions in 1909 by which McLean had secured assignments of one-half the share of each of his sisters and in the autumn of 1916 Bugher brought action in the Supreme Court of the District of Columbia to establish his right to a one-third interest instead of a one-sixth interest in the mines. In 1918 Mrs. Dewey retained counsel to protect her interests and to join in this suit for the purpose of establishing her right to a one-third interest in these mines. This action came on for trial on January 2, 1919. On January 15, 1919, an agreement of settlement was executed. Under this agreement the interests of Bugher and of Mrs. Dewey were increased from one-sixth to one-fourth with the right to an accounting on that basis from the date of the receiver's sale in 1895, interest to be adjusted on the basis of 4 per cent. It was further provided that after the death of Mrs. Dewey, one-twelfth of her one-third interest was to pass to Bugher.

In the meantime Loudon, who had owned an interest in these mines prior to the foreclosure in 1895, appeared and asserted a one-half interest therein, claiming that McLean had agreed at the time of the foreclosure suit to protect his interest. Neither Bugher nor Mrs. Dewey, the taxpayers here involved, learned of this claim of Loudon until 1916. In March, 1917, Loudon filed a suit in equity against the estate of McLean, Mrs. Dewey, and Bugher for an accounting of one-half of all of the earnings of the mines from 1895 to the date of judgment and for an undivided one-half interest in the mines. After such suit was brought the Trust Company refused to distribute any of the accumulated or current earnings of the mine pending a determination of the rights of Loudon. After a three weeks' trial in April, 1919, the Loudon case was settled before decision in consideration of the payment to Loudon of $325,000, all of which was paid to him in cash in 1919 from the accumulated earnings of the mine.

Although the earnings were not distributed in full, the taxpayers have in each year returned their distributive share of the profits, whether distributed or not, apparently regarding the operation of the mine as a partnership or joint venture. This method of returning the profits has been followed by the Commissioner and the parties

are agreed that it is proper. Their differences arise in attempting to determine how much, if any, of the amount paid Loudon is to be deducted from income and how much is to be regarded as a capital expenditure. This same question arose before the Supreme Court of the District of Columbia when it became necessary to apportion this payment between the corpus and the income of the estate of John R. McLean. The court there decided that 71.3985 per cent was to be charged to corpus and 28.6015 per cent to income. In computing the deficiencies the Commissioner used these same percentages with respect to the taxpayers. The petitioners point out that the division directed by the Supreme Court of the District in the McLean estate was based on the ratio existing between the capital value of the mine at the date of death of John R. McLean and income subsequently derived and that the same ratio is not to be applied in the case of the petitioners. This the respondent now admits and claims that no allowance should have been made because of such settlement.

We can not agree with the petitioners that the amount paid Loudon is entirely chargeable against income or deductible as a loss, nor can we agree with the respondent's contention that it was all paid to protect or enlarge the petitioners' capital.

Loudon sought two things: First, to establish his ownership to a one-half interest in the mine and, second, to secure one-half of the past earnings. Had he been successful the taxpayers would have lost one-half of their capital and one-half of the earnings of the mine, whether previously distributed or accumulated. The payment to Loudon settled both claims. It seems that the court was clearly correct in apportioning such payment between income and corpus and that the same principles require that such an apportionment be made for income-tax purposes. The date nearest to the settlement and as of which figures are available is January 1, 1919. The parties have stipulated the depleted value of the mine as of that date and have also stipulated the amount of the earnings to that date. It was to protect their interest in these two amounts that the taxpayers made the payment to Loudon and it is proper that such payment should be prorated between capital and income upon the basis of the stipulated amounts of each as of January 1, 1919.

In the last analysis the question is not whether this payment to Loudon may be deducted but involves a determination of the amount of the actual income of each year as distinguished from the apparent or bookkeeping income. Assuming that the taxpayers each owned a one-quarter interest in the mine and its income, the respondent determined that their income was a certain amount. But Loudon claimed one-half of it. Until Loudon's claim had been adjudicated or settled, it was not possible to say what were the distributive shares of the taxpayers. The most that could be said was that they claimed

certain amounts and if their claims were sustained their income would be that amount. But it was necessary to pay over a portion of the claimed amount to Loudon and it is the reduced amount which in fact is their distributive share in the profits.

The Commissioner suggests that if this payment is to be apportioned, it should be on the basis of the March 1, 1913, value of the mine and the earnings subsequent to such date. Though ingenious, the suggestion is not sound, for the March 1, 1913, value had nothing to do with the claims advanced by Loudon and settled by the taxpayers and, moreover, such a basis would entirely disregard the depletion which had subsequently taken place and been transmuted into earnings. The distributive share of each of the taxpayers in the income from the mine should be adjusted in each of the taxable years by prorating the payment made to Loudon on the basis indicated above.

In connection with the prosecution of their claims against the McLean estate and in defense of the action brought by Loudon, the taxpayers paid various amounts for attorneys fees and expenses as follows:

| Year | Bugher | Mrs.Dewey |
|---|---|---|
| 1916 | $9,994.99 | |
| 1917 | 10,560.96 | |
| 1918 | 43,067.08 | |
| 1919 | | $5,000.00 |
| 1925 | 15,000.00 | |

The services rendered by the attorneys included counsel and advice on the matter of the income impounded by the trustees of the McLean estate and approval of disbursements made by such trustee. The payment of $15,000 made in 1925 represents a compromise of a larger claim made by an attorney for services rendered in said suits. Petitioners contend that such payments are either ordinary and necessary expenses of conducting the mining venture, or losses, and in either event deductible from income. The respondent contends they are not allowable as deductions. It is our opinion that to the extent that such payments related to the rights of the taxpayers to retain the income or enlarge their share in the income of the mine, they are deductible; while to the extent that they represented expenditures made to acquire Loudon's interest in the mine or to enlarge their own interests as against the McLean estate, or to defend their title to the mine, such payments are in the nature of capital expenditures to be added to the other costs of the property and recovered as are such other costs. The ratio to be used will be the same as that with respect to the Loudon settlement.

We are confronted with a further difficulty when we come to determine over what years the portion of the expenditure for legal services which is chargeable against income should be allowed as a deduction. The situation here is different from the payment made to Loudon, for that payment went to decrease the amount of gross income from the mine which should be reported, while here the question is not one of arriving at gross income to be reported but of establishing the amount which is deductible from gross income in arriving at net income. It might be possible to so apply the statute with respect to deductions as to prescribe a complicated mathematical formula for computing the amount which should be deducted in the year in which each payment was made. We have before us in these proceedings, however, all of the years which are affected to any substantial degree by these expenses and the advantages of knowing the outcome of the suits. When we consider these matters and the basis on which income from the operation of the mine is returned, we conclude that the portion of these expenditures which is deductible should be prorated over the years involved on the basis of the income from the mine for each of such years.

Under the agreement which was entered into by Mrs. Dewey, Bugher and the McLean estate, an accounting was to be had adjusting their rights to receive income from the mine on the basis of a one-quarter interest in each of the first two named and a one-half interest in the McLean estate. Interest was to be charged on overpayments and credited on underpayments at the rate of 4 per cent. The result disclosed that each of the petitioners was entitled to a net credit of interest although the adjustment for some of the years in question was a charge against the petitioners. It is claimed by petitioners that this interest is properly to be accounted for as chargeable to each of the years in which there was a credit or debit adjustment, while the respondent has included the net adjustment as income in 1919.

The right to interest first arose under an agreement entered into in 1919. While this agreement required that the adjustment be made for prior years, no obligation to pay or right to receive interest existed in such prior years. Such obligation and right first arose in 1919, and we are of the opinion that the respondent acted correctly in determining that the net adjustment of interest was income in 1919.

Reviewed by the Board.

*Decision will be entered on 25 days' notice, under Rule 50.*

TRAMMELL did not participate.